# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

November 5, 1998

Cecil W. Crowson
Appellate Court Clerk

YONG MUN CHONG MEADOWS,           )
                                  )
    Plaintiff/Appellee,           )
                                  )
                                  )    Appeal No.
                                  )    01-A-01-9801-CH-00054
VS.                               )
                                  )
                                  )    Montgomery Chancery
                                  )    No. 95-11-0118
TOMMY C. MEADOWS,                 )
                                  )
    Defendant/Appellant.          )

APPEALED FROM THE CHANCERY COURT OF MONTGOMERY COUNTY
AT CLARKSVILLE, TENNESSEE

THE HONORABLE JAMES E. WALTON, JUDGE

YONG MUN CHONG MEADOWS
2177 Powell Road
Clarksville, Tennessee 37043
    Pro Se/Plaintiff/Appellee

GREGORY D. SMITH
One Public Square, Suite 321
Clarksville, Tennessee 37040
    Attorney for Defendant/Appellant

AFFIRMED AS MODIFIED
AND REMANDED

BEN H. CANTRELL,
PRESIDING JUDGE, M.S.

CONCUR:
KOCH, J.
CAIN, J.

# O P I N I O N

The trial court granted the parties a divorce, divided the marital property, and awarded the wife permanent alimony. On appeal, the husband contends that the court should have adjusted the property settlement to take the wife's post-separation dissipation of marital assets into account, and that it should have placed some limitations on the alimony award. We agree, and we modify the decree to incorporate the necessary changes.

## I. Marriage and Divorce

Tommy Cleveland Meadows, a teacher of Economics , and Yong Mun Chong, a native of Korea, began living together in 1977. In 1985, a son, Daniel Thomas Meadows, was born to them. In 1987 they married. By that time, Tommy Meadows was a tenured Professor of Economics at Austin Peay State University in Clarksville.

The parties' marriage produced a daughter, Lucy Rebecca Meadows, who was born in 1992. The parties separated in August of 1995. In August of 1996, Yong Meadows went to the Rivergate Shopping Center in Nashville on a shopping trip with her daughter. Lucy disappeared during that trip. She is presumed kidnapped, and her whereabouts are currently unknown.

On August 12, 1996, Ms. Meadows filed a complaint for absolute divorce in the Chancery Court of Montgomery County citing irreconcilable differences and inappropriate marital conduct on the part of Mr. Meadows. He answered on August 14, 1996, denying that he had been guilty of inappropriate marital conduct, and praying for dismissal of the complaint. After a hearing, the trial court granted the

dismissal. However, on March 25, 1997, Mr. Meadows filed a counter-complaint, asking the court to grant him a divorce on the grounds of inappropriate marital behavior or adultery.

During the hearing of this case on April 1 and April 16, 1997, the parties stipulated that they both had grounds for divorce. At the conclusion of the hearing, the court declared the parties divorced pursuant to Tenn. Code Ann. § 36-4-129. Yong Meadows was granted custody of the children, and the court expressed its hope that Lucy would be found safe and healthy. Tommy Meadows was ordered to pay child support for one child, pursuant to the guidelines ($750.75, which is 21% of his net monthly income of $3,575), with the support to be increased if Lucy returns.

The court's division of marital property involved real property, financial assets, personalty and debt. The most valuable marital asset by far was a house and farm in Montgomery County. Although Ms. Meadows lived in the house, and wanted to remain there, the court found itself unable to divide the equity in the property without selling it. The court therefore ordered the property sold, with the equity to be divided equally between the parties. Considering the testimony as to the property's value, and the mortgage encumbering it, this would probably result in net proceeds for division of about $160,000.

The court also granted Ms. Meadows a 25% interest in the $58,844 in vested retirement funds that Mr. Meadows had accumulated at the time of divorce, to be paid after Mr. Meadows retires and becomes eligible to collect the funds. In view of Mr. Meadows' superior earning capacity, he was ordered to pay all the parties' debts, and hold Ms. Meadows harmless for the same, except for the car payments on the Ford Contour that she was awarded. The court also ordered Mr. Meadows to pay $1,000 per month as permanent spousal support and $3,000 in attorney fees. This appeal followed.

## II. Marital Property and Marital Debt

Mr. Meadows contends in his brief on appeal that he should not have been held responsible for $36,000 that Yong Meadows squandered after the parties' separation. He also argues that the trial court erred in failing to declare that his alimony obligation would terminate upon the remarriage of the supported party. Ms. Meadows did not file a brief in response to Mr. Meadows' brief, so this case must be decided on the basis of the record and the appellant's brief alone. Tenn.R.App.P. 29(c).

The record reveals that Mr. Meadows gave his wife generous financial support during the entire period of separation, even to the extent of giving her control of his entire paycheck of $2,800 a month. Despite the fact that she was given sufficient cash to cover the reasonable expenses of her household, there was uncontroverted testimony that Ms. Meadows ran up debt of about $16,000 on her Lowe's, Discover, and Visa credit cards between August 1995 and April 1997. She did not attempt to account to the court for this debt.

The record also shows that in 1995 Mr. Meadows received a $23,000 check to retire a note on a house which he had sold and financed for the purchaser, and which he had owned prior to his marriage. Mr. Meadows endorsed the check to his wife. She was unable to account for her disposition of the money, except for a $3,000 down payment on a car.

We must note that we found it difficult to understand the testimony of Ms. Meadows, even in its trancribed form. It must have been even more difficult for the attorneys involved, who had to formulate follow-up questions to poorly understood answers. Part of the problem was obviously due to the appellee's limited command of the English language, though we note that she has lived in this country for over

twenty years, and Mr. Meadows testified that her English was actually a lot better than she chose to demonstrate.

But a good part of the problem was also due to her unwillingness to give honest answers to direct questions about her use of the money given to her. At one point, while on the stand responding to questions regarding the $23,000 check that Mr. Meadows gave her, she stated that she had spent $7,500 of the $23,000 check on a car, and had paid North Carolina taxes to Mr. Meadows' first wife with a portion of the rest (something never even mentioned during her two depositions). The appellant's attorney impeached her testimony with excerpts from her deposition, including the following:

Q. Where do you have the money?

A. I don't have money anymore.

Q. What happened to it?

A. Spending.

Q. Okay. Let's back up. You bought a car. What car did you buy? Is that the car you're now driving?

A. Yes.

Q. You bought the car that you are now driving which is a Ford Contour. You've told us that. Do you know how much you paid for it?

A. I think so. Two, $3,000.

...

Q. What did you do with the other $20,000?
A. Buy clothes, buy groceries, take children to games. Raining, movie.

Q. How many dollars worth of clothes did you buy?

A. Oh, some of them expensive. Some of thems very cheaper because I looking for the good sale.

Q. How much did you spend?

A. I don't know.

Q. Did you spend $1,000?

- 5 -

A.      Many thousand.

Q.      Many thousand?

A.      Yes sir, because he never hardly buy me clothes.

Q.      Are we talking about five thousand, ten thousand? How much do you spend on clothes?

A.      I don't remember, I don't keep the receipt.

In view of her obviously wasteful dissipation of valuable assets, Ms. Meadows should be required to reimburse her former husband for the $20,000 that she could not account for. We also believe that the portion of the trial court's order dealing with marital debt should be modified to require her to pay up to $16,000 on the Lowe's, Discover and Visa debt. To the extent that Mr. Meadows has already paid these debts, she should be required to reimburse him or account for these totals if the house and farm have not been sold and the proceeds divided.

## III. Alimony

The alimony portion of the trial court's opinion reads as follows:

> In this case, there is a great disparity in the needs and abilities of the parties. Mr. Meadows is well-educated, experienced in business, tenured in his teaching position and fully capable of earning income for various sources. Mrs. Meadows, on the other hand, has no job skills, speaks very broken English, and has no ability in the foreseeable future of earning any significant income. Mrs. Meadows has a need for support. Mr. Meadows has the ability to provide that support. After payment of child support, Mr. Meadows will have disposable income of approximately $2700 per month. Mrs. Meadows' only income will be approximately $740 per month child support and what she may earn, if any, from investment of the proceeds from the sale of the farm. It is not likely that she will have any funds to invest if she purchases a home for herself and her children. Given these facts, Mr. Meadows will pay to Mrs. Meadows the sum of $1000 per month as permanent spousal support. When Mr. Meadows retires, this support payment will be reduced by the amount of retirement paid to Mrs. Meadows.

Though the opinion, and the final decree, speak of permanent alimony, the terms of the award seem to indicate what is called alimony in futuro or periodic alimony. Alimony in futuro is permanent in the sense that the obligation is not extinguished upon the payment of a specific total sum, as is the case of alimony in solido and rehabilitative alimony. *McKee v. McKee*, 655 S.W.2d 164, 165 (Tenn. App. 1985). But it is not necessarily permanent, because the obligation may be modified or eliminated upon a showing of a change of circumstances. Tenn. Code Ann. § 36-5-101(a)(1).

The appellant argues that alimony in futuro is not appropriate in this case, because the legislature has stated its preference for the payment of rehabilitative temporary support and maintenance, where the economically disadvantaged spouse is capable of being rehabilitated. Tenn. Code Ann. § 36-5-101(d)(1). He argues that the appellee's employment history indicates that she is capable of earning her own living, and that the order of the court gives her no incentive "to stand on her own two feet."

We disagree. Ms. Meadows may very well be capable of working and earning money, but in view of her age (44 at the time of trial), lack of skills, and poor proficiency in the English language, we find it unlikely that she will ever be able to support herself fully by her own efforts. We also do not believe that the alimony award will destroy her incentive to work. Especially after Daniel is grown, and (assuming Lucy does not return) when she is no longer receiving child support, we suspect that she will want to work and will need to supplement her alimony check. But that check will give her the security of a "floor" under her income, to protect her from extreme economic hardship.

It has been customary, however, in cases of alimony in futuro, to state in the decree that the alimony will terminate if the recipient remarries or dies. Such

a statement is consistent with the legislative intent indicated by Tenn. Code Ann. § 36-5-101(a)(2)(B). We believe that it would be helpful to modify the trial court's decree to declare that the alimony it awarded is indeed alimony in futuro, and that it will terminate upon the death or remarriage of the recipient.

## IV.

The decree of the trial court is affirmed in all respects, except that it is modified in regard to the division of marital property and in the provisions for the payment of marital debt, as discussed above. It is also modified in regard to the permanence of the alimony award. Remand this cause to the Chancery Court of Montgomery County for proceedings consistent with this opinion. Tax the costs on appeal equally between the appellant and the appellee.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.

CONCUR:

_____
WILLIAM C. KOCH, JR., JUDGE

_____
WILLIAM B. CAIN, JUDGE